HUNT v. KANE.

(Circuit Court of Appeals, Seventh Circuit. March 22, 1900.)

No. 620.

**1. MASTER AND SERVANT—INJURY TO SWITCHMEN—NOTICE OF DEFECTS.**
An extra hand employed in railroad switch yards, who worked in different yards, where there were many switches, and in which men were continually employed in making repairs, cannot be charged, as matter of law, with knowledge of the defective condition of the blocking of a particular switch in one of such yards, which he was required to use in the nighttime, by reason of which defect he was injured, although it had existed for some time, and was obvious in the daytime.[1]

**2. SAME—DEFECTIVE BLOCKING OF FROGS.**
The rule that a railroad company is not guilty of negligence in failing to block the frogs in its switch yards, which renders it liable for an injury to a switchman working in such yards who has knowledge that no blocking is used, is not applicable to a case where a company undertakes to maintain blocking, but allows it to become defective, and a switchman is injured because of its defective condition.

**8. SAME—ACTION FOR INJURY TO SWITCHMAN—PROXIMATE CAUSE.**
The fact that a switch engine leaked steam so badly as to prevent the engineer from seeing a signal to stop made by a switchman, who had caught his foot in a frog, and who was run over and injured, cannot be found to be the proximate cause of the injury, if it appears that the cars were so close to the man when the signal was given that they could not have been stopped in time to prevent it, even if the signal had been seen and obeyed.

---

[1] As to duty of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.

**4. SAME—NEGLIGENCE OF MASTER—DEFECTIVE ENGINE.**

A railroad company cannot be held liable for an injury to a switch-man caused by the fact that the engine used by the crew leaked steam so that it prevented the engineer from seeing a signal to stop, where the engine was in good condition when it was taken out by the crew, but became defective while they were using it, and they continued its use without objection.

In Error to the Circuit Court of the United States for the Southern District of Illinois.

This was an action by Patrick Kane against the receiver of the Toledo, St. Louis & Kansas City Railroad Company to recover damages for a personal injury received while in the employ of the receiver as a switchman in the railroad yards of the company at Madison, Ill. The declaration contained two counts, —one alleging that Kane, while about to couple cars, was run over and injured by having his foot caught in a frog defectively made and insufficiently blocked; the other alleging that the engine which Kane was working with was so defective and out of repair that it leaked steam, so that when Kane got his foot fastened in the frog, and attempted to give the signal to stop, the escaping steam prevented the engineer from seeing the signal, by reason of which he was run over by the switching car. The evidence on both sides was directed to prove or disprove these two issues, and was somewhat conflicting. The evidence shows that Kane entered the service of the receiver September 27, 1897, and was assigned to work with the yard crews in the Madison and East St. Louis yards. He was considered as an "extra man," and worked at night. Much of his work was away from the Madison yards, he being assigned to any crew that might be short of a man. The crew he worked with usually had a different engine every night. There were three yards, the one furthest east being known as the "Madison Yard," and west of these were the other two, the East St. Louis and the stock yard. In these yards there were three crews engaged in switching cars. The crews were named after the names of the yards in which they worked. Though each crew worked mainly in the yard after which it was named, yet its duties were not confined to that yard. In the course of the work each crew would frequently have occasion to work in each of the different yards, either in delivering cars or making up trains. The East St. Louis and stock yard crews, in the regular course of their work, frequently handled cars in the Madison yards, Kane working at different times with each of these crews. In the Madison yard, where the accident took place, the tracks of the railroad ran due east and west. A plat of the yards contained in the record shows the place of the accident and the surrounding premises. North of the track is the telegraph office and switchman's house. On the third track south of this building, and a little east, is a switch known as "No. 8 Slip Switch," and called by the employés the "Puzzle,"—a switch connecting four tracks, and of a somewhat intricate construction. Only the immediate surroundings of the "Puzzle" and the first frog east of it are in question here. This frog, leading from track No. 10 into a track known as "Lead No. 2," was the frog at which Kane claimed to have been injured. Upon the diagram of the "Puzzle" this frog appears on the right-hand side. On the left side is another frog of similar construction. The frog proper consists of a solid casting 15 or 16 feet long. At each end it is joined to the rails of the track. The different parts of a frog are known by the following terms: The short point between the rails is called the "point" of the frog. The parts on either side of the "point," where the ends of the rails spread, are called the "wings." The part of the frog opposite the "point," where the rails widen out before joining the track proper, is known as the "heel." Just ahead of the sharp "point" is a small wedge-shaped opening known as the "bootjack," which cannot be blocked on account of the danger of derailment of the cars, or other danger to the running of the cars over the frog. In blocking a frog four blocks are used,—one in the heel, one in each of the wings, and one back of the "point." In the passage of trains, owing to the difference in the depth of the flanges on the wheels of the cars, the blocks in the wings are exposed to greater wear than in the other parts of the frog, and are frequently split and

100 F.—17

cut up. On November 2, 1897, Kane was working with a crew in the Madison yards composed of the foreman, James Donahue, two switchmen, John Connors, Frey, the engineer, and a fireman. They began work at 7 o'clock in the evening. After some switching had been done, it became necessary to couple to the train they had in charge a car standing on the "Puzzle." The engine, attached to some 24 cars, was standing east of the switch. The engine was attached to the east end of this string of cars, and was headed to the west, and pushing the cars before it. Kane was standing near the "Puzzle," on the north side of the track, close to the stationary car, which they desired to attach to the train. Kane was there to draw the pin and make the coupling. Donahue stood on the same side of the track, three or four car lengths east from Kane, and Connors stood on the same side, a little nearer the engine. The track curved slightly to the south, and the men were stationed in this manner to take the signals and pass them to the engineer, Kane being in a position where he could not signal directly to the engineer. There is considerable conflict in the testimony of the plaintiff's own witnesses as to just how the accident happened, particularly in regard to the signals given by Kane, and repeated by Donahue and Connors and the other members of the crew, to the engineer. Kane's relation of the matter is that, as the engine and cars were approaching, he stepped into the track to take the link out of the drawhead of the standing car, as he knew there was a link in the drawhead of the approaching car, and it was always better to use that link than the one in the stationary car. After taking the link from the standing car, and throwing it to one side, towards the north, he stepped out in the same direction, and at the same time threw up his lamp, giving the signal to slow down. That, in stepping out, he passed over the first frog east of the "Puzzle," and in doing so put his left foot inside the wing of the frog and upon the blocking, which slipped or gave way, and his foot caught in the frog, and was held there. As soon as he felt that his foot was fast, he gave the signal to stop, swinging his lamp out on the right hand side of the track. The approaching cars were then within three car lengths, or within about ninety feet, of the frog. That the cars kept moving, passing over him, cutting off both legs just below the knee. Connors' statement differs from that of Kane in several particulars, and he is mainly corroborated by Donahue. He says: "We pulled the train of 23 cars off the track 13, and kicked one car down what we call 'No. 2 Lead,' that we switched on, and we threw another one in. After we picked up two more cars, we came down with the train of 24 cars to couple on this one car, and as we were going down, about two car lengths from where Kane was hurt, he gave me the slow signal, and I repeated it to the engineer. Whether the engineer didn't catch the signal, we came down,—struck the car. I heard Kane holler, and the foreman was between me and Kane. I ran by the foreman. Came to where he was lying along the track, with his feet right across the point of the frog, both feet cut off. How he got caught in the frog I couldn't say, because I was five or six car lengths ahead of him. Where the block was placed in the heel of the frog, where the wheels ran over them, the blocking was all whittled in the frog where the running of the flange of the wheel over the wood chipped the block all up. The blocking was all cut and worn out from the flange of the wheel passing over it. I couldn't say how his feet got fast exactly, but where I had taken his feet off the track it was right at the point, a little above the point of the frog, his two legs hanging there. He was lying down, with his head southward along this lead. The frog was loose and worn out. There was not anything to keep it in position. The nails were all loose that nailed it to the tie. The engine was in bad condition that night. She was leaking steam. Her piston was leaking. The piston was blowing so bad when I coupled her on in front that you couldn't see the cab of the engine at seven o'clock in the evening. The steam escaped from the piston on the right-hand side. Donahue, the foreman, was the nearest man to Kane. I gave the engineer a slow signal. I do not know whether he got it or not. He said he couldn't see it. All I saw was the steam escaping pretty thick between me and the engineer. The engine had been that way several nights that we had been working with her. Kane was standing just this side of the end of the car the last time I saw him. The next thing he gave me the signal by holding his lamp out. He was on the right or west side of the track. I repeated

Kane's signal to the engineer, who did not slow up until just before Kane stepped in to make the coupling. When this signal was given, the cars were within two car lengths of Kane." Seeing that they were not slowing down, Connors says he gave the engineer the stop signal. This signal was answered, and the cars "straightened out" just before Kane went in to make the coupling. Kane gave the stop signal just as he stepped in to make the coupling. Connors did not repeat that signal, as he had already given it to the engineer. This is perhaps a sufficient statement of the evidence for the plaintiff to show what the issues were, and how the testimony was directed to proving them.

Clarence Brown, for plaintiff in error.

M. Millard, for defendant in error.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

BUNN, District Judge, after stating the case as above, delivered the opinion of the court.

There were a great many exceptions taken on the trial to the plaintiff's testimony which are preserved in the bill of exceptions, and form the foundation for many assignments of error, which it will not be necessary to consider. At the close of the testimony the plaintiff asked for two special instructions to the jury, the first of which was to take the case from the jury under both counts of the declaration. The second was to take it from the jury under the second count, which made the bad and defective condition of the engine and the consequent escaping of the steam a ground of negligence. Both these instructions were refused, and we think properly, as there was evidence given under each count sufficient to entitle the plaintiff to have the issues submitted to a jury.

The court gave a general charge to the jury, which it must be said was perfectly fair and impartial so far as it went, but did not cover all the different aspects of the case as presented by the testimony. The counsel for the plaintiff requested the giving of a large number of special instructions in addition to those already mentioned, all of which were refused by the court, upon what ground, whether thought to be incorrect or because the same points were sufficiently covered by the general charge, does not appear. It is always safe for the trial court to refuse special instructions en masse, provided it be quite sure that the general instructions cover the same points, but otherwise it is a rather unsafe practice, and not always to be commended. Some of these instructions were properly refused, certainly one or two of them should have been given, while some others seem very doubtful.

The fourth request was as follows:

"A railroad employé, working in a railroad yard where there are many tracks, frogs, guardrails, and other appliances used in the work of switching, must use his senses to observe the condition of the appliances with and around which he is required to work. He is charged by the law with knowledge of such defects in such appliances as are obvious and apparent. If, therefore, you find from the evidence that the frog in which it is alleged Kane caught his foot was defective, and had been so for some time prior to the accident, and that the plaintiff, in the ordinary course of his work, had to and did frequently work over and upon the same, and that it was then reasonably ap-

parent that its condition might endanger the safety of the switchman working over or upon it, then the plaintiff is presumed to have known the condition of the said frog and the danger, and if he was injured by reason of its defective condition he cannot recover in this action."

This instruction, we think, was properly refused. It told the jury that the plaintiff was charged by the law with knowledge of such defect in such appliances as are obvious and apparent. This may be so in the abstract or under some circumstances. When must these defects be obvious and apparent? This work was being done in the nighttime, when it might be very difficult to see at the moment whether blocking was in good condition or not. The plaintiff was an "extra" hand in that yard. He worked in other yards as well. The evidence was that the blocking had to be repaired continually, and that men were detailed for that business. Kane had nothing to do with that duty. Must an employé working in the dark take notice of what he might have seen the day before in the daytime if he had been on the ground? Must he know and remember the condition of every frog in all the yards, whether they are in order or not? We cannot think there is any such presumption that the plaintiff must have known the condition of the frog and the danger. That was a question of fact, to be fairly submitted to the jury on the evidence.

The eighth request, which was taken bodily from Southern Pacific Co. v. Seley, 152 U. S. 145, 14 Sup. Ct. 530, 38 L. Ed. 391, was as follows:

"If you find that the 'wing' of the frog in which Kane's foot was caught had no blocking, and at the time in question railroad companies used frogs with and without blocking in the wings in railroad yards, and that it was questionable which was safest or most suitable for such business, then the use of a frog with unblocked wings was not negligence, and the plaintiff is not entitled to recover upon the first count of his declaration."

But the court refused to give said instruction, to which action of the court in refusing to give said instruction to the jury the defendant, by his counsel, then and there excepted.

The Seley Case was reversed by the supreme court because this instruction was not given, but it does not follow from this that the same instruction was proper in the case at bar. In that case the railroad company had not undertaken to block their frogs, and the switchmen worked with knowledge of that fact. Here the railroad company, and the receiver after it, had adopted the plan of blocking, but the evidence was directed to show, and tends to show, that they had allowed it to become worn out and loose from want of proper repair. We think this instruction was also properly refused. But there are others of a more doubtful character. Those numbered 6, 7, 10, 11, and 16 are of this character. These may be prima facie and technically correct, but, on the other hand, without any qualification, they might prove to be misleading to a jury. As it is not necessary, we do not now determine whether it was error to refuse them, but only wish to call attention to their doubtful character in case there should be another trial of the case. The attorney who drew those instructions evidently intended to hew as close

to the line as was possible, so that, whether given or not, his client would be the gainer, and the supposition is that he succeeded very admirably.

Instruction numbered 12, intended to cover one phase of the case not presented by the general charge of the court, was as follows:

"If you find from the evidence that the switch engine with which Kane was working was so leaky and defective that the escaping steam obscured the view of the engineer, so that he was unable to see the signals given by the switching crew, yet if you further find that when the 'stop' signal was given by Kane, and repeated to the engineer, the approaching cars were so close to Kane that they could not have been stopped in time to save him from being run over, even if the signal had been seen by the engineer as soon as it was given, then you are instructed that such defective condition of the engine was not the proximate cause of Kane's injuries, and that, in determining whether or not the defendant was guilty of negligence, you must not take into consideration the condition of the switch engine or any of the proof introduced on that question."

We think this instruction should have been given, and that it was error to refuse to give it. The witness Connors, as shown in the statement of the case, gives the condition of the engine as being so defective as to interfere with the work. But he does not say that the signals were not received by the engineer, or that they were not obeyed. The evidence tends to show that Kane's signal was given at a time when it would have been quite impossible to have stopped the train in time to have prevented the accident. Kane gave the stop signal either just as he stepped in between the cars or after he was caught. He gave it but once, and immediately after giving it he was run over. So that, upon this theory, if the stop signal had not been answered at all, that would not have caused the accident, and so could not have been the proximate cause. This instruction was evidently intended to present this aspect of the case for the finding of the jury, and, as there was nothing in the general charge presenting the same question, it should have been given to the jury.

For similar reasons we think the instruction numbered 15 should also have been given. That was as follows:

"Even if you should find that the defendant's switch engine, at the time of the accident to Kane, leaked steam so badly that the engineer was unable to see the signals given by the yard men, and that the accident to Kane was caused by such defective condition of the engine, yet if you further find that the engine was not leaking steam when it was turned into the roundhouse, at 7 p. m. on the day of the accident, by Schuler, the engineer who had used it during such day, and that the defects and leaks arose after the engine had been taken over by Kane's crew, and that such crew continued working with said engine in spite of its leaky condition, and neither returned it to the roundhouse nor reported the defects in it to their superiors, or the officials who had charge of the repairs of such engine, then the plaintiff cannot recover under the second count of his declaration."

Kane's crew began work at 7 o'clock. According to Connors' testimony, the engine had been leaking steam badly for several days. Engineer Schuler, however, who had worked with the engine all that same day from 7 a. m. to 7 p. m., testified that it was not leaking steam when he turned it over to Donahue's crew at 7 p. m. This left it as a disputed question on the testimony whether the de-

fective condition of the engine arose after Donahue's and Connors' crew took it that evening. If the jury should find that the engine was in good condition when Donahue and the plaintiff began work with it at 7 p. m., that would have a material and decisive bearing upon the question of negligence on the part of the receiver. It would hardly be reasonable to suppose, if the engine had been in good condition all day until turned over to the plaintiff's crew, that the receiver could have had notice of its bad condition on that evening, so as to put him in fault for not repairing. This phase of the case was in no manner submitted to the jury by the general charge, and we think it was error for the court to refuse this instruction. Judgment is reversed, and the case remanded, with instructions to grant a new trial.